IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 9, 2024 Session

IN RE KURT R., ET AL.[1]

**Appeal from the Juvenile Court for Anderson County**
**Nos. J-37059/22-0423; J-37060/22-0424       Brian J. Hunt, Judge**

_____

**No. E2023-01108-COA-R3-PT**
_____

This action involves the termination of a father's parental rights to his minor children. Following a bench trial, the court found that clear and convincing evidence existed to establish the statutory grounds of severe child abuse and failure to manifest an ability and willingness to assume custody of the children. The court also found that termination was in the best interest of the children. We affirm the trial court's termination decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J. and KRISTI M. DAVIS, J., joined.

Agnes Trujillo, Strawberry Plains, Tennessee, for the appellant, Kurt R., Sr.

Jonathan Skrmetti, Attorney General & Reporter, and Mara L. Cunningham, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.      BACKGROUND**

Kurt R., Jr. ("Kurt") and Casey R. ("Casey") (collectively "the Children") were born to Christina R. ("Mother") and Kurt R., Sr. ("Father") in January 2010 and March 2011, respectively. Mother and Father were divorced and shared custody of the Children.

---

[1] This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

On October 27, 2021, local law enforcement responded to an emergency call at Mother's residence based upon a report of a man striking a child. Father admitted to "spanking" Kurt as punishment. Mother confirmed that Father used his belt to "spank" Kurt. She recorded the incident on her cellular telephone and showed the video to law enforcement upon their arrival. The video, approximately two minutes and 10 seconds in length, is best described by the trial court as follows:

[Father] is heard saying to [Kurt] "take your f*cking sweatshirt off." [Kurt] can be seen standing in the yard, without shoes, in shorts and a sweatshirt; [Kurt] removes his sweatshirt. [Father] then shouts at [Kurt] "we are cutting your f*cking hair off." [Father] screams "do you understand me[?]" [Father] shouts, "what is all this shit your f*cking mother showed me[?]" and strikes the child, open-handed, on the left side of the child's face. [Kurt] is seen grabbing his ear and stepping back as [Father] continues to close the gap and advance toward the child. [Father] then strikes [Kurt] again on the same side of his head. [Father] screams "what is all of it[?]" [Father] is seen removing his belt, then states "come over here you little c*cksucker, get on this f*cking pole." [Kurt] and [Father] can be seen walking to the clothesline. [Father] tells [Kurt] to "grab the pole, bend over." [Kurt] hesitates and [Father] shouts "you f*cking hear me right[?]" [Kurt] is heard crying saying "yes." [Father] yells "if you don't stand here and take it I'm just going to keep going." [Father] is heard continuing to scream and [Kurt] is seen bending over. [Father] strikes [Kurt] with the belt once and [Kurt] is seen falling to the ground. [Kurt] begins screaming "my back, it hurts, my back." [Father] gets on top of [Kurt] in what appears to be an attempt to flip [him] over to his stomach. [Kurt] is heard screaming and crying "please daddy" repeatedly. [Father] screams "you don't f*cking listen, this has been coming for a long f*cking time." [Father] flips [Kurt] onto his stomach. [Kurt] can be heard screaming "no" and crying; [Father] strikes [Kurt] four more times. [Kurt] is observed to be attempting to get away from [Father,] but [Kurt] is pinned down during the strikes on the left side of his body with [Father's] knee on [Kurt's] back. After the fourth strike[, Kurt] frees himself and attempts to move away. [Father] lunges toward [Kurt] and [Kurt] screams "no, please." [Father] advances and flips [Kurt] again to his stomach. [Kurt] again screams "no, please stop" and [Father] shouts "no, you stop" pinning [Kurt] with his knee on [his] back and begins striking [him] again. [Father] strikes [Kurt] nine times and all while calling [Kurt] a "bad f*cker," another strike can be heard and [Kurt] cries out saying "it hurts so bad." [Kurt] is seen trying to get free of [Father] but [Father] gets on top of [him] and shoves [his] face into the ground. [Father] is observed struggling and [Kurt] says "I'm sorry" and [Father] screams "no you're not, you're lying, you're a f*cking liar" while [Kurt] is crying "daddy please." [Father] then flips [Kurt's] feet over [his] head. [Father] screams "keep your f*cking hands off me and stay still"

- 2 -

then screams "do you hear me[?]. [Kurt] cries and says "yes." [Father] flips [Kurt] over while [Kurt] screams and [Father] starts holding [him] down harder and [Kurt] is seen struggling and is heard gasping stating "I can't breathe," to which [Father] says "I don't care" and continues to strike [him]. At this point in the video, Casey can be heard screaming in the background. [Mother], who has been filming this entire event without appropriate attempts to intervene[2] is then heard saying "it's okay, Case." [Kurt] can still be heard screaming and trying to get free and eventually frees himself. [Father] gets up and is seen walking toward the camera. [Mother] is heard saying during that time "It's okay Casey. It's okay Casey. Stop, he was bad." [Kurt] can been seen trying to walk but stumbling and then vomiting. At the end of the video[,] [Father] says "why are you recording me[?]"

The responding police officer noted several red marks and welts to Kurt's back, arms, and buttocks. Father was arrested and later pled guilty to child abuse, a Class A misdemeanor.[3]

The video was also provided to the Tennessee Department of Children's Services ("DCS"). Following their initial investigation, DCS removed the Children based upon the trial court's entry of an emergency protective custody order on November 15, 2021, based upon Father's physical abuse and Mother's failure to intervene. The Children have been together in foster care since the time of removal. Father was ordered to have no contact with the Children, except through therapeutic visitation when recommended by a therapist.

As pertinent to this appeal, DCS developed permanency plans for Father with the following requirements: (1) enroll in anger management classes; (2) complete a full psychological assessment with a parenting component and follow recommendations; (3) complete a mental health assessment and follow recommendations; (4) complete a parenting assessment and follow recommendations; (5) enroll in parenting classes and provide proof of completion; (6) enroll in offender domestic violence classes and provide proof of completion; (7) provide proof of reliable and legal income; (8) provide proof of transportation; (9) provide proof of stable, safe, reliable housing, and submit to unannounced visits; (10) resolve any pending legal issues; (11) submit to random drug screens; (12) visit regularly once permitted; and (13) remit child support. Father was also tasked with completing all assessments and classes in an open and honest manner and to sign releases to allow DCS to track his progress. Father was aware of the requirements and had been advised of the criteria and procedures for termination of his parental rights.

---

[2] Mother is heard on video telling Father to stop a few times but did not otherwise intervene.

[3] He was placed on diversion, and his charge was ultimately dismissed per the agreement.

The Children were later adjudicated as dependent and neglected and it was further found that they were victims of severe child abuse on March 23, 2022.[4] DCS was relieved of making reasonable efforts at reunification because of the severe abuse finding. DCS filed a petition to terminate each parent's parental rights on April 22, 2022, based upon the statutory grounds of severe child abuse and failure to manifest an ability and willingness to assume custody.[5] The case proceeded to a hearing on March 30, 2023, with a second day of testimony concluding on July 20, 2023.

Desirae Shelton, a DCS foster care manager, testified that she was assigned to the Children's case at the time of removal. Ms. Shelton viewed the video of the incident, which was played for the court. She confirmed that the video viewed in court was the video received by DCS from Mother.

Ms. Shelton confirmed that the Children have not had any contact with Father since the time of removal shortly after the incident. She provided that Casey stated that she was fearful of Father as a result of the way in which he disciplined Kurt. Ms. Shelton stated that the Children are in a pre-adoptive home together and are "doing well." She believed they had bonded with the foster family and were also excelling in school and extracurricular activities. She claimed they are less anxious since the time of removal. She explained that at the time of removal, the Children would not make eye contact but that they now make eye contact when speaking with others.

Ms. Shelton testified that the Children received individual counseling through Next Step Behavioral Health. They began counseling in July 2022 and were discharged in September 2022, for a total of five appointments. She explained the delay in services was based upon a lack of availability of counseling services contracted through DCS.

Ms. Shelton agreed that Father resolved his legal issues and completed the required assessments and classes, but she was unsure whether he fully complied with the recommendations. She has not visited his current residence to confirm its suitability because DCS was relieved of reasonable efforts as a result of the severe abuse finding.[6] She agreed that he provided proof of stable housing and employment and that he has since started his own electrical company. She further acknowledged that he also attended individual therapy. However, she claimed that Father downplayed his actions in his parenting assessment and psychological examination. She explained that Father even advised her personally that the incident escalated because Kurt "would not just stand still and take a couple of licks with the belt." She claimed that Father also advised in his

---

[4] Father has appealed the adjudication and finding of severe child abuse. His appeal was set for trial after the termination hearing.

[5] Mother voluntarily surrendered her parental rights and is not a party to this appeal.

[6] Father also requested that any further contact with DCS be made through his attorney.

assessments that the incident was a one-time event when Casey claimed that Father hit Kurt against the head with an open hand and had also punched him in the leg at other times.

Andrea Beck, the DCS investigator assigned to this case, testified that she received the referral alleging child abuse in late October. Pursuant to her investigation, she visited the home and spoke with Mother, her boyfriend, and the Children after the incident. She viewed the marks on Kurt's back, legs, and hips. The marks were different lengths and were "red and purple and blue in color." Ms. Beck provided that Catherine Oteiza, a DCS case manager who initially responded to the referral, forwarded the video of the incident to her.[7] Ms. Beck also watched the video with Mother during her investigation.

Ms. Beck observed the Children's forensic interviews. She recalled that Casey stated that she stopped for lemonade on the way home but that she wished she would have come home sooner to warn Kurt. Casey recognized Kurt's screams as she walked across the bridge on the way home from school. Ms. Beck explained that the Children's middle school is about a football length from their apartment complex. The incident occurred at the clothesline area outside of the complex. She confirmed that Kurt was pictured in the video, that Casey can be heard screaming in the background, and that Mother referred to Casey in the video as "Case." She recalled that Casey advised that Father disciplines Kurt "differently" and that he gets "a lot more spankings." Casey also reported that Father punched and knocked Kurt against things and had cut up his stuffed animals. Father confirmed to Ms. Beck that he had cut up Kurt's toys on another occasion as a form of punishment. Ms. Beck recalled that the family reported that there were previous interactions with DCS; however, she did not have possession of any such records.

The audio recording of the adjudicatory hearing was admitted into the record. At the hearing, Father agreed to his role in the incident depicted in the video. He explained that he took this disciplinary action too far. Father stated that the situation escalated because Kurt would not stand still and "take a couple of licks" with the belt. Father explained that he disciplined Kurt on that day because of messages Kurt sent to Casey and because of Kurt's online search history that he found concerning. He also admitted to disciplining Kurt more in general than Casey due to his behavior. He clarified that in the past, he either "smacked" him on the buttocks or that he "got onto" him verbally. He agreed to calling Kurt a "little c*cksucker" prior to the incident in question.

Foster Father testified that he was familiar with Kurt prior to their placement in his home because Kurt went to an event with his son. He has observed a big change in the Children's demeanor since their placement in November 2021. As to Kurt, he stated,

---

[7] Ms. Oteiza testified that she responded to the referral in Ms. Beck's stead at the Children's school. She stated that Mother texted her the video of the incident, which she viewed the first few seconds of before forwarding the video to her supervisor and Ms. Beck.

[H]e's become more social, not timid. When he first came to the house, he was really shy on stuff, quiet. If he got in trouble, he wouldn't say [anything]. I'll just say if he did something wrong, he wouldn't say [anything]. He would try to hide it and wait [until] everybody was in a good mood, then bring it out. He pretty much – he was scared, honestly.

He explained that Kurt would drop his head down and "kind of shake" when Father is mentioned. He stated that Casey also referred to Father as "Satan" and Father's home as the "devil's home." He recalled that Casey advised that they "pretty much lived in the basement" with no windows and that the food was locked away.

Foster Father believed that the Children have improved socially and academically while in his home. He continued,

Socially, [Kurt has] gotten away from a lot of trouble kids he used to hang with. School, he's straight A's. He had all A's and B's this year. The fourth marking period, he had straight A's. We're big on the grades for him[.]

He provided that Casey also made straight A's for the whole year and made the principal's list. He stated that they were both involved in sports, with Casey involved in track and field and Kurt involved in soccer and track and field. He expressed a desire to adopt them into his family should they become available for adoption.

Foster Father acknowledged that Kurt has been suspended twice while in his care. He explained that one instance involved some accidental damage to school property when Kurt's hand went through a wall while he was doing a push-up. The second incident involved a fight between Kurt and another kid who had been bullying Kurt.

Clifford Miller, a licensed clinical social worker, testified that he completed Father's clinical parenting capacity assessment. His assessments were based solely upon Father's account of the events. He did not review case recordings, the video of the incident, the Children's statements, or Father's psychological evaluation. He acknowledged that his inability to interview the Children or observe the Children with Father was a deficit to his evaluation. He explained that Father's psychological examination was not complete when he performed his assessment and that he was reliant upon Father to provide any other necessary records for the assessment. When given a chance to review the psychological report during questioning, Mr. Miller acknowledged that Dr. Wilson had revised the report following her viewing of the video of the incident to reflect Father's effort to downplay the incident.

Mr. Miller described Father as "very emotional, very remorseful, [and] very upset" about the incident. He stated,

[Father's] eyes teared up. They became glassy and tearful and red. His voice was shaky. He repeated himself multiple times, shook his head in dismay at his actions, was able to describe his actions so intensely, using words like being irate, out of control. Those are words you don't usually hear from someone who doesn't believe that what they did was wrong and that they didn't feel bad about what they did.

He recalled that Father reported an abusive childhood. Despite Father's childhood, he did not view a pattern of abusive behavior from Father with the Children. He stated,

[A pattern would be exhibited by repeated] incidents of the same thing. Now, a spanking would not necessarily count as a pattern. Yelling alone would not necessarily count as a pattern. You may begin to look at them, but there needs to be substantial maladaptive behavior or abusive behavior that has occurred on more than one occasion for there to be what we would consider a pattern of behavior.

He admitted that knowledge of past instances of physical or psychological abuse could have altered his opinion but that Father denied any past instances of such abuse.

Mr. Miller believed that reunification between Father and the Children was possible based upon the information he reviewed. He explained,

First of all, he's admitted to what he's done. Second of all, he's exceptionally remorseful. Third, he is willing to look at his past and to make the necessary changes to make sure that he would never promote any form of abuse . . . for either of his children ever again.

Mr. Miller stated that through counseling and other interactions that he has given Father the tools to manage his anger when faced with certain "triggers" like the misinformation provided by Mother. He agreed that Father overreacted to the misinformation but has never justified or minimized his actions. He stated that Father admitted alcohol abuse shortly after the incident as a form of self-medication. He explained that Father took steps to correct his alcohol dependence and ultimately completed an alcohol and drug assessment and followed the recommendations. Based upon his testing, counseling, and further interactions with Father, Mr. Miller claimed that Father was not likely to reoffend.

Mr. Miller criticized the therapeutic care provided to the Children and explained that they should not have been discharged upon the completion of a few sessions, especially given Kurt's diagnosis of adjustment disorder and post-traumatic stress disorder. He explained that to provide such diagnoses would require a minimum of four to six sessions to confirm or a psychological examination. He stated that his ability to determine whether such a diagnosis was warranted was limited by the fact that he had not seen the video, the

DCS records, or any forensic interviews. He believed that Kurt was likely still symptomatic as evidenced by his suspension from school that involved a physical fight.

When asked about the incident on the video, Father testified at the hearing that he "lost it" and "basically blacked out." He admitted that he was out of control and acted inappropriately. He explained that he had never whipped either child with a belt or hit them in the face before the incident in question. He continued,

> I went way overboard, and I absolutely do love my children, and that's why I continue to go to therapy and I continue to try and show the court that I do love my children. And this was heinous, and it was absolutely a one-time thing.

He stated that he has since completed all that was required of him by DCS and that his child abuse charge has been expunged as a result of his compliance with diversion. He also works with Mr. Miller about every three weeks. He has learned coping mechanisms to prevent further overreactions. He expressed love for the Children and has repeatedly requested to see them. He is employed and has appropriate housing, a driver's license, and car insurance. He claimed that the Children never had any disciplinary problems when he was the sole caregiver for the nine months prior to the shared custody arrangement.

Following the hearing, the court issued a final order in which it found that the evidence presented established the statutory grounds of severe child abuse and failure to manifest an ability and willingness to assume custody. The court found that termination of Father's rights was in the best interest of the Children. This appeal followed.

## II.    ISSUES

We consolidate and restate the issues pertinent to this appeal as follows:

A.    Whether the court erred in quashing Kurt's subpoena to testify.

B.    Whether the court abused its discretion in its rulings on the admissibility of evidence throughout the trial.

C.    Whether the proceeding was manifestly unfair.

D.    Whether clear and convincing evidence supports the court's finding of the statutory grounds for termination.

E.    Whether clear and convincing evidence supports the court's finding that termination was in the best interest of the Children.

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652–53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

Although parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See In Re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interest[ ] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523–24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

Lastly, in the event that the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). "Thus, this court gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359t, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

## IV.    DISCUSSION

### A.

Father first takes issue with the trial court's quashing of his subpoena for Kurt's testimony, filed the day before trial. Rule 107(b) of the Tennessee Rules of Juvenile Practice and Procedure provides that "[w]ith the exception of [certain hearings] or for good cause shown, all subpoenas for attendance of witnesses shall be served at least 5 calendar days prior to the hearing." The trial court did not abuse its discretion in quashing the subpoena because it was untimely filed. *See generally State v. Mangrum*, 403 S.W.3d 152,

166 (Tenn. 2013) (providing that rulings on a motion to quash a subpoena are subject to an abuse of discretion standard).

B.

Father questions several of the trial court's rulings related to the admissibility of evidence. Rulings on the admissibility of evidence are within a trial court's discretion. *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222–23 (Tenn. Ct. App. 1999). "A trial court abuses its discretion only when it 'applie[s] an incorrect legal standard or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). We will address each argument in turn.

*Admission of Kurt's out-of-court statements*

Father takes issue with the admission of Kurt's out-of-court statements pursuant to Rule 803(25) of the Tennessee Rules of Evidence, which provides an exception to the rule against hearsay as follows:

> Provided that the circumstances indicate trustworthiness, statements about abuse or neglect made by a child alleged to be the victim of physical, sexual, or psychological abuse or neglect, offered in a civil action concerning issues of dependency and neglect pursuant to Tenn. Code Ann. § 37-1-102(b)(12), issues concerning severe child abuse pursuant to Tenn. Code Ann. § 37-1-102(b)(21), or issues concerning termination of parental rights pursuant to Tenn. Code Ann. § 37-1-147 and Tenn. Code Ann. § 36-1-113[.] Declarants of age thirteen or older at the time of the hearing must testify unless unavailable as defined by Rule 804(a); otherwise this exception is inapplicable to their extrajudicial statements.

Here, Kurt was 13 years old at the time of the termination hearing and was not unavailable as defined by Rule 804(a), thereby establishing that his extrajudicial statements were inadmissible and erroneously considered. DCS agrees but argues that such error was harmless.

Our harmless error rule considers whether the error "more probably than not affected the judgment." Tenn. R. App. P. 36(b).[8] We hold that the inclusion of such statements was harmless in this case because Casey, who was 12 years old at the time of

---

[8] "A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b).

the hearing, made the same statements concerning Father's pattern of abuse. *State v. Spratt*, 31 S.W.3d 587, 601 (Tenn. 2000) (holding the admission of hearsay evidence harmless when the same information was offered through other admissible evidence).

*Admission of other statements not related to abuse*

Father next takes issue with the court's admission of Casey's statements he believes were unrelated to past instances of abuse and neglect. Father argues that Rule 803(25) only permits statements related to abuse or neglect from those under the age of 13 at the time of the hearing. He asserts that their inclusion negatively affected the outcome, specifically the trial court's best interest finding in which the court held that Casey expressed her fear of Father and living in his house. The record reflects that Father did not object to these statements based upon hearsay; rather, Father objected based upon grounds of speculation. Moreover, the statements complained of related to the pattern of abuse and neglect present in the home and were admissible pursuant to Rule 803(25).

*Admission of the psychological evaluation*

Shannon Wilson, Ph.D., a licensed clinical psychologist, performed Father's psychological evaluation. Dr. Wilson was declared an unavailable witness pursuant to Rule 804 of the Tennessee Rules of Evidence.[9] Her report was entered into the record in her stead. However, the court did not cite any exceptions to the hearsay rule in support of its ruling to admit the report. No such exception is applicable to permit the admission of the entire report. *See* Tenn. R. Evid. 804(b)(1)-(6). The court cited the report in its determination that Father had not been truthful and downplayed his past behavior and the extent of the physical violence present in the video. However, this same evidence was independently provided by Ms. Shelton, who testified that Father downplayed the incident in his psychological examination with Dr. Wilson. Dr. Miller, who reviewed the report during questioning, also admitted that Dr. Wilson revised her report once she viewed the video to reflect Father's effort to downplay the incident. With these considerations in mind, we hold that the erroneous admission of the report was harmless.

*Admission of the video*

Father next takes issue with the court's admission of the video itself, citing concerns that the video was not properly authenticated and that a chain of custody was not established. Father argued at trial that Ms. Shelton was not present when the video was recorded and could not know whether Mother altered the video. The Tennessee Rules of Evidence require authentication or identification as a condition precedent to the

---

[9] Providing that the trial court may declare a witness unavailable when the declarant "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance by process[.]" Tenn. R. Evid. 804(5).

- 12 -

admissibility of evidence. Tenn. R. Evid. 901(a). The condition precedent is fulfilled by "evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). Such evidence may include testimony of a witness with knowledge or even voice identification. Tenn. R. Evid. 901(a)(1), (6). Ms. Shelton testified that the video played for the court was the video received by DCS from Mother. Having interviewed Kurt and Casey, Ms. Beck identified Kurt's physical presence in the video and further identified Casey's voice in the video. Father likewise admitted his presence in the video during his direct examination and at the adjudicatory hearing. Ms. Beck asserted that the video presented was the video she received from Ms. Oteiza and the same video she viewed with Mother. The video was properly identified and admitted.

*Admission of the Children's counseling records*

Father objects to the admission of the Children's counseling records because he was not provided with the opportunity to review them prior to their entry into the record. Rule 803(6) of the Tennessee Rules of Evidence permits entry of records of regularly conducted activity "if it was the regular practice of that business activity to make the [record] as shown by [] certification." Such certification must comply with Rule 902(11) of the Tennessee Rules of Evidence, which requires the "party intending to offer a record into evidence" to "provide written notice of that intention to all adverse parties" and to "make the record and declaration available for inspection sufficiently in advance of their offer into evidence." The record confirms that DCS failed to make the record available for inspection prior to their offer of the records into evidence. However, such error was harmless when Father concedes that the trial court did not rely upon these records and when Father also used the records in support of his claim that the Children did not receive adequate therapeutic care. Father has failed to establish how he was prejudiced by this error.

C.

Father argues that the trial court's numerous evidentiary errors throughout the trial, its failure to separate the adjudicatory hearing from the termination hearing, and its failure to prepare its own independent order led to a manifestly unfair proceeding that requires reversal. The record reflects that several of the errors complained of were not actually errors or were harmless. Moreover, this court has previously rejected the application of the cumulative error doctrine in termination proceedings. *See In re Bentley J.*, No. E2022-00622-COA-R3-PT, 2023 WL 2380507, at *17 (Tenn. Ct. App. Mar. 7, 2023) (rejecting the application of the cumulative error doctrine); *In re Kaycee M.*, No. M2017-02160-COA-R3-PT, 2018 WL 4778018, at *8 n.8 (Tenn. Ct. App. Oct. 3, 2018) (agreeing with DCS that no Tennessee court has applied the doctrine in a civil case); *In re Abbigail C.*, No. E2015-00964-COA-R3-PT, 2015 WL 6164956, at *25 (Tenn. Ct. App. Oct. 21, 2015) (rejecting a cumulative error argument before ultimately holding that the minor errors

complained of do not "outweigh the court's interest in finality that must be a cornerstone of all termination of parental rights proceedings").

As to the trial court's use of a party-prepared order, Tennessee Rules of Civil Procedure 52.01 provides that "[i]n all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment." Our Supreme Court has ruled that such findings and conclusions stated in the order must be "the product of the court's independent judgment." *Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303, 316 (Tenn. 2014). Orders prepared by the trial court are preferred but not necessarily required for review by an appellate court. *Id.* at 315–16. Generally, party-prepared orders are permitted if "two conditions are satisfied. First, the findings and conclusions must accurately reflect the decision of the trial court. Second, the record must not create doubt that the decision represents the trial court's own deliberations and decision." *Id.*

Our review of the court's oral ruling from the bench indicates that the trial court clearly stated its findings and conclusions as to the statutory grounds and the factors included in the best interest analysis. Further, the record does not create doubt that the decision reviewed and signed by the court represents the court's own deliberations and decision. The trial court's order is sufficient for our review in accordance with Tennessee Rule of Civil Procedure 52.01. We will now proceed with our analysis.

D.

As indicated above, the trial court granted the termination petition based upon the following statutory grounds: (1) severe child abuse and (2) failure to manifest an ability and willingness to assume custody of the Child. Father appeals the trial court's findings as to each ground, which we will address in turn.

1.      Severe child abuse

Effective July 1, 2024, the Tennessee General Assembly revised the termination statutes and made various changes to the termination grounds and statutory definitions therein. The provisions of the revised statutes do not apply to this action, heard in March and July 2023. At the time of the hearing, the pertinent statute provided that a trial court may terminate a parent's rights if the parent "has been found to have committed severe child abuse . . . under any prior order of a court or is found by the court hearing the petition to terminate parental rights . . . to have committed severe child abuse against any child." Tenn. Code Ann. § 36-1-113(g)(4) (2023). "Severe child abuse" is defined as "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death." Tenn. Code Ann. § 37-1-

- 14 -

102(b)(27)(A)(i) (2023). "Serious bodily injury" includes but is not limited to "injuries to the skin that involve severe bruising . . . including those sustained by whipping children with objects." Tenn. Code Ann. § 39-15-402(c) (2023).

The video documents Father's over 2-minute physical altercation with Kurt. The responding officer noted several red marks and welts to Kurt's back, arms, and buttocks following the incident. Ms. Beck likewise observed several marks on Kurt that were of different lengths and were red, purple, and blue in color. Even without the benefit of the video, Father admitted to the use of force, claiming that he "lost it" and "blacked out" and hit Kurt numerous times. He described the event as "heinous." While Kurt did not require immediate medical attention, the incident at issue involved the use of a belt buckle and Father's hands, all while holding the child down to the point that he complained of an inability to breathe and ultimately vomited. With these considerations in mind, we hold that clear and convincing evidence established that Father's use of force was likely to cause serious bodily injury or death. The statute at the time of the hearing did not require a finding that the parent abused all children at issue in the termination proceeding. Rather, the statutory ground allows termination when a parent commits severe child abuse "against any child." Tenn. Code Ann. § 36-1-113(g)(4) (2023); *see In re Trinity H.*, No. M2020-00440-COA-R3-PT, 2020 WL 5110312, at *10 (Tenn. Ct. App. Aug. 28, 2020) (affirming ground based upon an order adjudicating the child's siblings as victims of severe child abuse). Thus, clear and convincing evidence supports the trial court's termination of Father's parental rights to both children on the ground of severe child abuse.

### 2.  Failure to manifest an ability and willingness to assume custody

Pursuant to Tennessee Code Annotated section 36-1-113(g)(14) parental rights may be terminated when:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). This ground requires the petitioner to prove two elements by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1), (g)(14); *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). First, a petitioner must prove that the parent failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. *In re Neveah M.*, 614 S.W.3d at 674. Second, a petitioner must prove that placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. *Id.*

- 15 -

As to the first element, our Supreme Court has instructed as follows:

> [S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*Id.* at 677 (citation omitted).

As to the second element, whether placing the child in the parent's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child," we have explained:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Virgil W.*, No. E2018-00091-COA-R3-PT, 2018 WL 4931470, at *8 (Tenn. Ct. App. Oct. 11, 2018) (quoting *Ray*, 83 S.W.3d at 732 (footnotes omitted)).

The record reflects that Father failed to establish an ability to care for the Children. While Father completed the requirements of the permanency plan, he did not participate in an open and honest manner. Father did not provide the video or admit his pattern of behavior as it related to Kurt in either his parenting assessment or psychological examination. Father continued to downplay his past behavior at the termination hearing, thereby establishing that he has not addressed the circumstances that led to the Children's removal and readied himself for their return to a safe and stable home. From these facts, we agree with the trial court that Father displayed an overall lack of an ability to assume legal and physical custody of the Children. The record further supports a finding that placing the Children with him would pose a risk of substantial physical or psychological harm to their welfare given his past instances of abuse and failure to fully address the same. We affirm the trial court's judgment terminating Father's parental rights on this ground.

E.

Having concluded that there was clear and convincing evidence supporting at least one statutory ground of termination, we must now consider whether termination of Father's parental rights was in the best interest of the Children. Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a termination ground, "the interests of the parent and the child diverge" and the court focuses on the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. A finding that at least one ground for termination of parental rights exists does not necessarily require that a parent's rights be terminated. *Id.* Because some parental misconduct is redeemable, Tennessee's termination of parental rights statutes recognize "that terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* The facts a court considers in the best interest analysis "must be proven by a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). After making the underlying factual findings, the court "should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

The statutory best interest factors applicable to this action are as follows:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

- 17 -

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[ ] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[ ] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's). We will group our discussion of the best interest factors "based on the overarching themes within the list of twenty factors" under the circumstances of the case because many of these factors touch on similar factual predicates and involve similar issues. *In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *14 (Tenn. Ct. App. May 15, 2023).

We consider first the Children's emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(1)(A) (concerning the need for stability), (B) (concerning how changes in caretakers affect wellbeing), (D) (concerning the parent-child attachment), (E) (concerning

- 19 -

visitation), (F) (concerning whether the children are fearful of the parent), (H) (concerning attachment to others), (I) (concerning relationships with others), (T) (concerning the parent's fitness and its corresponding impacts). With respect to these factors, the Children are bonded with their foster family and are excelling in their schooling and extracurriculars. While Father was prohibited from visitation following removal, the trial court concluded, and the record supports, that Father did not maintain a healthy parent-child attachment with either child prior to removal. Casey reported a sense of fear as it related to Father, and Kurt exhibited a sense of fear at the mention of Father. Father's refusal to acknowledge his past behavior and the extent of the incident that led to the removal evidenced a lack of concern for the Children and his parental role.

We turn next to the Children's physical environment and well-being. *See* Tenn. Code Ann. § 36-1-113(i)(1)(G) (concerning whether the parent's home triggers or exacerbate the children's experience of trauma or post-traumatic symptoms), (O) (involving the parent's prior provision of safe and stable care to any child), (Q) (involving the parent's commitment to having a home that meets the children's needs), and (R) (involving the health and safety of the home). Casey reported a pattern of physical and emotional abuse as it related to Kurt. Questions remain as to the safety of Father's home as evidenced by his failure to fully address his past behavior in his parenting assessment, psychological examination, and at the termination hearing. While Casey was not physically harmed and was not included in the pattern of abuse, she expressed regret for stopping for lemonade on the way home from school because she was not there to protect Kurt. Casey should be free to stop for after school treats without fear of Father harming her brother in her absence.

Next, we consider Father's efforts. *See* Tenn. Code Ann. § 36-1-113(i)(1)(C) (involving the parent's continuity in meeting the children's needs), (J) (involving the parent's lasting adjustment of circumstances), (K) (involving the parent's use of available resources), (L) (concerning efforts made by DCS); and (M) (concerning the parent's sense of urgency in addressing the circumstances that led to removal). Many of these factors are inapplicable because DCS was not fully involved once they were relieved of reasonable efforts as a result of the severe abuse finding. Father's failure to acknowledge the extent of his behavior that culminated in the severe abuse in his parenting assessment, psychological examination, and at the termination hearing evidenced a lack of effort on his part to meet the Children's needs.

With regard to support and knowledge of the Children's needs, Tenn. Code Ann. § 36-1-113(i)(1)(S) (addressing the parent providing more than token support), (P) (addressing the parent's understanding of their needs), the record reflects that Father is able to financially provide for the Children while in his care.

The trial court considered all the evidence, weighed the credibility of the witnesses, and concluded that the best interest factors supported termination by clear and convincing

evidence. Upon our review of the evidence, we agree with the trial court's assessment and findings. Accordingly, we conclude that clear and convincing evidence in the record supports a determination that termination of Father's parental rights was in the Children's best interest.

## V. CONCLUSION

The judgment of the trial court is affirmed. The case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Kurt R., Sr.

_____
JOHN W. McCLARTY, JUDGE